# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

NICHOLA JOHNSON,

        Plaintiff,

v.

    Case No.   -cv-
    Hon.

SINGH SENIOR LIVING, LLC, and
STEVEN TYSHKA

        Defendants.

## COMPLAINT

Now comes the Plaintiff and alleges the following against the Defendant:

## PARTIES

1. Plaintiff is an African American resident of Mecklenburg County, North Carolina. She was employed by Defendant in Mecklenburg County as the Executive Director of a residential facility for seniors called Waltonwood Cotswold from December 2018 until her wrongful discharge in February, 2020.

2. Defendant Singh Senior Living, LLC ("Singh") is a Michigan limited liability corporation duly registered with the Secretary of State of North Carolina to conduct business in North Carolina. It owns and operates residential facilities for seniors, primarily in Michigan but also three in North Carolina and one in Virginia.

3. Defendant Singh was Plaintiff's employer under applicable North Carolina law and 42 U.S.C. 1981 and, to the extent it is relevant, under Michigan's Civil Rights Act.

4. Defendant Tyshka is a resident of Michigan and an employee of Singh.

## JURISDICTION AND VENUE

5. Plaintiff brings this action under the common law of North Carolina and 42 U.S.C. § 1981 and, to the extent applicable, Michigan's Civil Rights Act.

6. The Court has federal question jurisdiction over the claim under 42 USC 1981 and supplemental jurisdiction over the state law claims.

7. Plaintiff does not believe venue is proper in this Court, as all matters in controversy occurred in North Carolina, but is forced to file in this Court under a "pre-dispute resolution agreement" that requires her to file any legal claims in the federal or state courts for Oakland County.

8. All witnesses in this case, save for Defendant Tyshka, reside in North Carolina and all acts complained of occurred there. Plaintiff files in this jurisdiction under protest and reserves the right to move to change venue given the circumstances of this case and the interest of the courts of North Carolina in protecting the rights of its citizens.

## FACTS

9. Defendant Singh hired Plaintiff as Executive Director ("ED") of Waltonwood Cotswold in December 2018.

10. Singh operates high-end facilities whose residents are affluent and, at Waltonwood Cotswold, were 100% white.

11. Plaintiff was only the second black ED for Singh when hired. Both were fired in short order. Singh also hired a black woman as a regional operations director hiring Plaintiff, but also fired her just months after Plaintiff. In an effort to deflect attention from this pattern of quickly firing black leaders, it promoted a black woman to an ED position in Michigan at the time it started the process of firing Plaintiff. But that internal hire had been passed over for promotion at least twice in favor of less qualified white employees.

12. When it hired Plaintiff, Waltonwood Cotswold had a dysfunctional leadership team and several long-time staff who chafed at being held accountable.

13. The challenge for a black leader in this residential and work environment were considerable. Plaintiff set out, with company approval to change the culture of the work force.

14. When she formally warned two department heads (the Business Office Manager and Culinary Services Manager) who were white about their performance, with regional HR's support, the white employees stated explicitly that they were not comfortable reporting to a black superior and ended up separating from the company.

15. The changes in staffing and expectations created tensions in the workplace, and some staff complained to each other and to residents about Plaintiff, creating another layer of issues. But as Plaintiff made the changes, the results were objectively demonstrated.

16. Further, by the time of her annual review in August 2019, Waltonwood Cotswold has reached a number of firsts, both for itself and for Singh as a company - the first 100% census (full facility), the best cost control, the highest net revenue, and the first deficiency-free state inspection.

17. Waltonwood Costwold as a result met or exceeded its objective goals for each quarter or 2019, entitling Plaintiff and her leadership team to quarterly bonuses under Singh's compensation plan.

18. The regional director of operations in North Carolina wrote Plaintiff's annual review in August, rating her as exceeding expectations in 12 of 15 measurements, and meeting them in the other three. He then wrote the following summary appraisal, extolling her:

> Nichola has been a great addition to the WW family. She has brought a level of accountability and structure to a community

3

> that had seen many firsts as they were becoming a stable community. Nichola continues to listen to feedback. In fact, she handles feedback better than any other ED I've ever supported. During her short time, Nichola has reduced turnover and pushed the team to stay nearly 100% occupied over the last few months. She's focused on delivering high satisfaction and ensuring DH's support their teams to do so. In addition, she's supported open positions (specifically culinary) in long gaps without a DH very well. Nichola quickly jumped into the role and began setting firm expectations with her DHs and team. During this time, there were some perceptions that she was too tough and unfair. Nichola worked closely with those around her to continue to stay the course. I applaud her for taking feedback and working on her delivery during the first six months of her time at WW. Now, we have supervisors and staff alike reaching out to applaud the accountability in certain departments. Since making some changes on the DH team, the concerns regarding her communication and fairness has subsided and has been *non-existent* with the current DH team. I challenge Nichola in the coming months to continue to focus on staff engagement while balancing the accountability. This can be attained by continuing to celebrate successes and having spontaneous fun throughout the months.

19. When she was hired, Plaintiff had extensive prior experience in this industry and asked for a starting salary of $115,000, but was offered $105,000 instead and told an adjustment could be made after her one-year anniversary based on her objective performance.

20. After her annual review in August, Plaintiff received a 4% raise.

21. Based on exceeding goals in census, budget management, state inspections and improvements in staffing, Plaintiff asked for a larger increase. The regional director told Plaintiff that an additional increase would be considered at or after her anniversary date in December.

22. As December approached, Plaintiff had to prepare a facility budget for 2020 and asked the Regional Director of Operations what she should do about the line item for her salary, given that an additional raise would be discussed.

23. The Regional Director stated that the additional increase in salary had to be approved by Defendant Tyshka at the corporate level at a later date and approved Plaintiff inserting a proposed salary in her budget.

24. Plaintiff submitted a proposed budget with a salary of approximately $118,000 and Tyshka exploded in anger when he saw it.

25. He travelled from Michigan to Charlotte, visited the facility, and then wrote Plaintiff up in late December with a "Last Chance Agreement" or "LCA" that threatened her immediate dismissal and disqualified her for the fourth quarter bonus, though she had met all of the metrics for entitlement and her staff received the bonus. She was denied the bonus, despite meeting all measures for earning it, solely because she had proposed a pay raise in her 2020 budget.

26. Plaintiff submitted a response to the LCA, challenging it as a punitive reaction to her proposed budget, and setting out a plan for addressing all of the issues raised in it.

27. Plaintiff then met all of the conditions of the LCA. At a meeting of the staff held in her absence in January 2020, the staff overwhelmingly approved of her leadership.

28. Also, the results of a third-party "secret shopper" survey that measured the way in which the facility was presented to prospective residents and families were released. They showed that Waltonwood Cotswold was the only Singh facility to score over 85% - with a score of 90.22%

29. The facility had met all of the established metrics to achieve an annual bonus for the management team. Every member of the team except Plaintiff was paid that bonus.

30. Tyshka then returned to Waltonwood in late January 2020 and interviewed two families of residents who had expressed dislike for Plaintiff, of the 117 families, and reviewed a survey in which 20 of 226 possible respondents rated Plaintiff "fair" or "poor" as ED.

31. Singh then fired Plaintiff on February 4, 2020 at Tyshka's direction. It held payment of the annual bonuses to Plaintiff's team until right after her termination. Singh then declared her ineligible for the annual bonus because she was not employed when it was paid.

## FIRST CLAIM FOR RELIEF
(**42 U.S.C. § 1981**)

32. Plaintiff incorporates all prior paragraphs by reference.

33. Plaintiff performed her job at a high level, meeting or surpassing the expectations of her employer, but, like other black employees in leadership positions, was terminated.

34. Plaintiff had the highest performance among all EDs by Singh's metrics, including best containing of costs, highest net revenue, highest census, fewest inspection deficiencies (none), and highest secret shopper rating. She also had broad support from her staff.

35. Blocking Plaintiffs' bonuses and terminating her when she was exceeding the performance of white Executive Directors constituted race discrimination in violation of 42 U.S.C. § 1981.

36. Plaintiff seeks and is entitled to actual and compensatory damages under 42 U.S.C. § 1988, as well as costs and reasonable attorney's fees.

## SECOND CLAIM FOR RELIEF
(**Wrongful Discharge**)

37. All prior paragraphs are incorporated by reference.

38. Defendant terminated Plaintiff on account of her race, African American.

39. Plaintiff performed her job at a high level, meeting or surpassing the expectations of her employer, but, like other black employees in leadership positions, was terminated.

40. Plaintiff had the highest performance among all EDs by Singh's metrics, including best containing of costs, highest net revenue, highest census, fewest inspection deficiencies (none), highest secret shopper rating. She also had broad support from her staff.

41. The North Carolina Legislature has declared in N.C.G.S. § 143-422.2, the North Carolina Equal Employment Practices Act that:

> It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of . . . . race . . .by employers which regularly employ 15 or more employees.
>
> It is recognized that the practice of denying employment opportunity and discriminating in the terms of employment foments domestic strife and unrest, deprives the State of the fullest utilization of its capacities for advancement and development, and substantially and adversely affects the interests of employees, employers, and the public in general.

42. Defendants' termination of Plaintiff on account of her race directly violated this express public policy of the State of North Carolina. Thus, the termination of Plaintiff was wrongful and unlawful under the common law of the State.

43. Alternatively, Plaintiff's termination also violated the laws of Michigan, specifically Mich. Comp. Laws Ann. § 37.2202.

7

44. As a result of her wrongful discharge, Plaintiff has suffered loss of employment and income and benefits, as well as humiliation and emotional distress. She seeks and is entitled to reinstatement with back pay and compensatory tort damages.

45. The actions of Defendant were taken and approved by a high-level manager who exhibited malice toward Plaintiff as well as willful and wanton disregard for her rights and well-being. Such actions were contrary to the public interest and warrant exemplary or punitive damages to the extent allowed by Chapter 1D of the General Statutes of North Carolina.

## THIRD CLAIM FOR RELIEF
### (Wage and Hour Violation)

46. All prior paragraphs are incorporated by reference.

47. Denying Plaintiff bonuses, she had earned by meeting agreed upon metrics, those bonuses being awarded to her staff on that very basis, violated North Carolina's Wage and Hour Law, N.C.G.S §95-25 *et seq.*

48. Plaintiff worked and lived in North Carolina at all times relevant to this Complaint and thus is protected by this state's wage and hour laws.

49. Under N.C.G.S. §95-25.2(4), Plaintiff was an "employee" whose wages are protected by the statute.

50. Under N.C.G.S. §95-25.2(5), Defendant Singh was an "employer" subject to the statute.

51. Under N.C.G.S. § 95-25.2(16), Plaintiff's bonuses earned for meeting work performance goals were "wages" under the statute.

52. Under N.C.G.S. § 95-25.8, and employer cannot deny an employee payment of wages earned.

8

53. The bad faith withholding of bonuses to punish Plaintiff for proposing a pay raise in her 2020 budget for the facility violated N.C.G.S. §§ 95-25.8, as she has earned the bonuses by meeting the established performance goals.

54. Under N.C.G.S. §§95-25.22(a), Plaintiff is entitled to recover these improperly withheld funds with legal interest under N.C.G.S. §24-1 from the date each bonus was withheld.

55. Further, under N.C.G.S. §§95-25.22(a1), Plaintiff is entitled presumptively to double liquidated damages -- an amount equal to the improper deductions, with statutory interest accruing from the filing date of this Complaint.

56. Under N.C.G.S. §§95-25.22(d), the Court may award costs and attorneys' fees.

## **FOURTH CLAIM FOR RELIEF**
### (Wrongful Discharge)

57. All prior paragraphs are incorporated by reference.

58. Terminating Plaintiff to block her from obtaining bonuses violated the public policy set out in North Carolina's Wage and Hour Act, and thus is actionable as wrongful discharge.

59. Specifically, Defendant terminated Plaintiff to avoid paying wages owed under N.C.G.S. § 95-25.8.

60. As a result of her wrongful discharge, Plaintiff has suffered loss of employment and income and benefits, as well as humiliation and emotional distress. She seeks and is entitled to reinstatement with back pay and compensatory tort damages.

61. The actions of Defendant were taken and approved by a high-level manager who exhibited malice toward Plaintiff as well as willful and wanton disregard for her rights and well-being. Such actions were contrary to the public interest and warrant exemplary or punitive damages to the extent allowed by Chapter 1D of the General Statutes of North Carolina.

## FIFTH CLAIM FOR RELIEF
### (Tortious Interference)

62. Plaintiff incorporates all prior paragraphs by reference,

63. Though terminable at will, Plaintiff's employment was a contractual relationship under North Carolina common law

64. Defendant Tyshka knew of that contractual relationship between Plaintiff and Defendant BAE Systems, Inc., and deliberately and, with legal and actual malice, interfered with that employment relationship without legal justification.

65. Securing the termination of Plaintiff's employment did not further or protect any legitimate business interest Singh or of Tyshka, but was merely vengeful for Plaintiff's proposing a pay raise in the 2020 budget for her facility.

66. As a result of tortious interference with Plaintiff's employment, Plaintiff lost her job and suffered lost wages and benefits, both past and future, as well as emotional distress.

67. Plaintiff seeks and is entitled to actual and compensatory damages from Defendant Tyshka for lost wages and benefits and other compensable harms resulting from this intentional interference in her employment with Defendant Singh.

68. Tyshka's conduct of involved legal and actual malice toward Plaintiff and willful and wanton disregard of Plaintiff's rights. Plaintiff seeks and is entitled to punitive damages against Defendant Tyshka to the extent allowed under Chapter 1D of the General Statutes.

## PRAYER FOR RELIEF

Upon the trial of this matter, Plaintiff prays that the Court enter Judgment for her and award the following relief:

a. Full equitable relief, including back pay and reinstatement, or, in lieu of reinstatement, reasonable front pay;

b. Compensatory damages under 42 U.S.C. § § 1981 and 1988 and the common law;

c. Punitive damages against Defendant to the extent allowed under Chapter 1D of the North Carolina General Statutes and under 42 U.S.C. § 1981a (b) and § 1988;

d. Her unpaid bonuses under N.C.G.S. §§95-25.22(a), with legal interest under N.C.G.S. §24-1 from the date each bonus was withheld.

e. Double damages on her wage and hour claim under N.C.G.S. §§95-25.22(a1)

f. The costs of this action, including reasonable attorney's fees under 42 U.S.C. § 1988 and N.C.G.S. §§95-25.22(d);

g. Interest on the judgment at the North Carolina statutory rate; and,

h. Any further the relief the Court deems just and necessary.

Respectfully submitted,

**GASIOREK, MORGAN, GRECO, McCAULEY & KOTZIAN, P.C.**

BY:  \_\_\_/s/ *Sam Morgan*
Sam Morgan (P36694)
Attorneys for Plaintiff
30500 Northwestern Highway, Suite 425
Farmington Hills, MI 48334
(248) 865-0001

Dated: August 3, 2020    smorgan@gmgmklaw.com

S. Luke Largess (N.C. Bar #17486)
TIN, FULTON, WALKER & OWEN, P.L.L.C.
301 East Park Avenue
Charlotte, NC  28203
Tel.:  704-338-1220
Fax:  704-338-1312
llargess@tinfulton.com
*Attorney for the Plaintiff*
*Por Hac Vice Application Pending*